## PIPER v. SPIRO et al.

### No. 17080.

Court of Appeal of Louisiana. Orleans.

May 8, 1939.

Rehearing Denied June 12, 1939.

Porteous, Johnson & Humphrey, of New Orleans, for appellant.

A. D. Danziger, of New Orleans, for appellees.

WESTERFIELD, Judge.

The plaintiff, Henrietta Arnaud Piper, brought this suit against Louis Spiro and Mrs. Ruby Spiro Pick, alleging that the defendants were the owners of the premises, No. 2530 Jena Street, which plaintiff occupied as a tenant on May 22, 1935, when she fell through the flooring on the rear gallery, injuring her leg and back. She alleges that her fall was due to the rotten and unsound condition of the gallery flooring caused by the neglect of the owners of the property. By original and supplemental petition the sum of $15,555.75 is claimed as damages which she itemizes as follows:—

| | |
|---|---:|
| Hospital bills | $ 25.00 |
| 11 X-ray treatments at $5.00 each (yet to be had) | 55.00 |
| Drugstore bills | 48.75 |
| Doctor bills to date | 400.00 |
| Doctor bills in the future, estimated | 500.00 |
| Medicine bills in future | 75.00 |
| For the balance of her life for twelve years and 3 months, at $7.00 per week, in accordance with the American Insurance Experience Table of Mortality, and inability to work | 4,452.00 |
| Pain and suffering, both physical and mental, for the future | 5,000.00 |
| | $15,555.75 |

After various preliminary defenses by way of exceptions, defendants answered, denying the existence of the defect in the gallery flooring and averred that the property was in good order and condition when the plaintiff entered into possession, and averred that if any defect developed in the leased premises during the occupancy of the plaintiff they had received no notice thereof, a consideration which relieved them of responsibility in damages because plaintiff had acquiesced in a clause contained in the rent receipt given her, reading as follows:—"Tenant rents this property with the understanding that no damages will be due by cause of fallen plaster or other unforeseen defects in steps or railing, balcony or if any defect appear in the house it should be reported at once for repairs in writing."

Following a trial upon the merits judgment was rendered in favor of defendants dismissing plaintiff's suit. She has appealed.

Henrietta Piper had been a tenant in the leased premises for four or five years. She lived there with her son, Joseph Piper. She was a washerwoman and earned about $7 per week. On the day that the accident is alleged to have occurred, according to her testimony, she had been washing clothes in her yard and, after hanging them on the line, was returning to her kitchen, with a small basin in her hand, when as she ascended the steps to the back gallery and after she had placed her foot on the flooring, two of the boards gave way and her left knee went through the flooring.

No one saw the accident except Mattie McDemmond, a friend of plaintiff, who was in her kitchen. She came to plaintiff's assistance, phoned Mrs. Pick and called plaintiff's son, Joseph Piper, who was working in the neighborhood, and told him of his mother's accident. When Mattie was asked whether plaintiff's leg was caught in the flooring when she went to her assistance she was unable to say because "I didn't pay that much attention". Subsequently, however, when asked how many boards were broken and having answered "two", she added "and her (plaintiff's) leg bent in there".

Plaintiff was on the witness stand a number of times and often described the manner in which the accident happened. She also demonstrated to the Judge and counsel, who went to the leased premises for the purpose of viewing the scene and having plaintiff give a more graphic description of the manner in which she was injured. Nevertheless, after carefully reading her testimony, we are unable to say whether plaintiff claims that her entire leg went through the floor to a point above the knee, or whether her knee alone went into the hole. In view of the statement of her friend, who was the first one to reach her after the accident, it would appear that only the knee, and not the foot and leg, went into the opening and we will, therefore, consider the case as though that were the contention of the plaintiff.

The first question which presents itself concerns the alleged fall of plaintiff. Was there a fall? and, if so, is plaintiff's condition due to and was it caused by the fall. The nature of plaintiff's injuries is of importance in the consideration of this question.

The doctor who first saw the plaintiff after the accident, Dr. Thomas E. Clements, paid six or eight visits and diagnosed her

trouble as a sprained knee, with "good prognosis". She was thereafter treated by Doctors Goldberg and Haydel and examined by Doctors O'Ferrall, Oakley and Rodick, and her condition diagnosed as "osteogenic sarcoma" of the left femur between the middle and upper portion. The femur is the bone in the leg between the hip and the knee. Osteogenic sarcoma is, we understand, cancer of the bone.

Many pages in the record have been devoted to expert evidence on the subject of whether osteogenic sarcoma can be caused by traumatic injury. The net result of this testimony is confusing. It seems to preponderate a little in favor of the affirmative and to the effect that that disease may be caused by trauma, but all of the experts agree that plaintiff's condition could be due to syphilitic infection and that is what defendants contend is the matter with her.

There is a blood test known as the "Wasserman" test in common use by the medical profession for the purpose of ascertaining whether a suspected patient is afflicted with syphilis. Dr. Martin O. Miller, who examined plaintiff on behalf of defendants, testified that he had found she had a diseased heart with a murmur at the apex, which he diagnosed as an aneurism. An X-ray was recommended and performed by Dr. Amadee Granger and two Wassermans taken which showed a "four plus positive". Dr. Miller was of opinion that the clinical findings, the aneurism, together with the condition revealed by the X-ray of the plaintiff's left femur and the positive Wassermans, showed conclusively that plaintiff's condition was due to syphilis and that there was no connection whatever between the syphilitic bone lesion and the alleged fall. He also testified that the modern thought in the profession was away from the idea that sarcoma could be caused by trauma, but in any event a traumatic sarcoma "must appear at the site of the trauma, which, in this instance, was plaintiff's knee, whereas the diseased bone area was several inches above the knee".

Dr. Aldea Maher testified that on March 15, 1938, she took a Wasserman test of plaintiff's blood with "strongly positive reaction".

Dr. Carl J. Tripoli, Assistant Professor of Medicine at Louisiana State University Medical School, examined plaintiff at the request of defendants' counsel. He testified that plaintiff's condition was due to some blood disease, which he believed to be syphilis, and not to cancer.

Dr. Louis Fortier made X-ray pictures of plaintiff on March 15, 1938, and testified that these pictures showed a definite bone lesion in the region of the inner side of the left thigh of the upper and middle third. As a result of his pictures and other findings he was convinced that the patient was suffering from syphilis.

Dr. Amadee Granger testified that his X-ray pictures of plaintiff's chest revealed an aneurism which is commonly caused by syphilis and that the positive Wassermans convinced him that plaintiff was suffering from that disease and not from osteogenic sarcoma. Moreover, the latter disease, he said, is rare in persons of plaintiff's age (63). He compared the X-rays he made of plaintiff with some made seven months earlier and testified that the progress of the disease during the interval indicated that the bone lesion from which plaintiff suffered was due to syphilis and not to cancer.

Dr. John Oakley, one of the physicians testifying on behalf of the plaintiff, declared that a Wasserman test had been made of plaintiff's blood by the Board of Health with negative results.

■ It is apparent that the medical expert evidence preponderates to the effect that plaintiff's condition is of long standing and is due to syphilis.

■ But, says counsel, if that be true, the fall could have aggravated her condition, and in that event defendants would, nevertheless, be liable. It is quite true that an aggravation of a dormant disease gives rise to a cause of action. Jackson v. Travelers' Insurance Company et al., 180 La. 43, 156 So. 169; Behan v. John B. Honor Company, 143 La. 348, 350, 78 So. 589, L. R.A.1918F, 862; Fox v. United Chemical & Organic Products Company, 147 La. 865, 86 So. 311; Craft v. Gulf Lumber Company, 151 La. 281, 91 So. 736; Hicks v. Meridian Lumber Company, 152 La. 975, 94 So. 903; Brooks v. Lewis-Chambers Construction Company, Inc., 13 La.App. 402, 128 So. 321. But the evidence does not justify a finding to that effect. The hole in the floor in which plaintiff claims to have fallen was 8 3/16 inches deep, 5 1/2 inches long and 3 1/2 inches wide. That hole is too small to have permitted the entry of plaintiff's knee with the foreleg being folded back and not deep enough for her foreleg to have entered to the depth of the knee. It is possible that she fell and that her knee, or some other part of her body, may

have come into contact with the floor, and some slight injury may have resulted from the fall—too slight, however, for judicial consideration. De minimis non curat lex. Certainly her fall could not have caused the syphilitic condition from which she is suffering and could not have aggravated the bone lesion resulting therefrom, not only because the hole was too small, but because the lesion was at a point distant from the alleged traumatic injury.

For the reasons assigned the judgment appealed from is affirmed.

Affirmed.